(46 Misc. Rep. 375.)

## In re EGAN'S WILL.

### (Surrogate's Court, New York County. February, 1905.)

1. WILLS—DELUSION—EVIDENCE.
   Evidence on presentation of an alleged will of an old woman, a victim
   of alcoholism, reviewed, and *held*, that it was the result of her delusion,
   and that legacies to the beneficiaries thereunder were induced by her false
   belief as to the aid which they had given and would give her in her deal-
   ings with imaginary enemies, which false belief was fraudulently created
   by the principal beneficiary.

2. SAME—CONFIDENTIAL RELATIONS.
   Where the clerk of the lawyer of the alleged testatrix draws the will and
   is the principal beneficiary, and stands in position of peculiar confi-
   dence towards the alleged testatrix, he is, in determining the question of
   fraud in inducing the drawing of the will, to be treated as if he were an
   attorney, and he must show that the alleged will expresses the honest in-
   tent of the alleged testatrix.

   [Ed. Note.—For cases in point, see vol. 49, Cent. Dig. Wills, §§ 383, 396.]

In the matter of the estate of Julia H. Egan. Proceedings on the
probate of an alleged will. Probate denied.

Norman W. Kerngood, for proponent.
David McClure, for respondent.

THOMAS, S. Mrs. Egan, the decedent, died on April 14, 1904,
from cirrhosis of the liver, resulting from excessive indulgence in
alcohol during many years. She was then about 53 years of age.
She left, her surviving, her husband; a nephew she had cared for
from childhood, and of whom she was very fond, and whom she com-
monly spoke of as her son; a niece, who was a favorite of hers;
and a brother and a sister were her next of kin and heirs at law.
She had had two sons, who both died in 1882, being then about five
and seven years of age, respectively, on the occasion of a visit
made by her with them to her old home in Ireland. The loss of
these children affected her deeply, and it was her statement that
she sought relief from her grief in the use of alcohol. She was the
owner of a house in Thirty-Fourth street, in this city, in which she
and her husband resided, and of personalty consisting of govern-
ment bonds and deposits in savings banks, and the aggregate value

of her estate amounted to $56,000 or more. In the fall of 1898 her husband caused her arrest for disorderly behavior and intoxication, and thereupon procured her to be examined as to her sanity by two physicians, both of high repute as specialists in mental diseases. These gentlemen united in a certificate to the effect that she was then mentally unsound. Upon this certificate, approved by a justice of the Supreme Court, she was confined in an asylum, where she remained for about two weeks. Up to this time her principal insane delusion, if not the only one, was that her husband was unfaithful to her, particularly with a woman of mature age named Temperton or Nolan, who was a domestic in the employ of a family living on the same block with her, one member of which was an aged lady named Cox, and the house in which they resided was spoken of as the "Cox house." She alleged that her husband was the father of a child by this woman, which child was cared for by him in a specified institution, and that he had married her. Prior to her arrest and imprisonment she had repeated this charge to many people, and had employed detectives to watch her husband in order to obtain evidence against him. One of these detectives, named Phelan, had desk room in an office occupied by Mr. Henry W. Leonard, a lawyer, Mr. Harry P. Leonard, his son and assistant, and Mr. Tyng, another lawyer, and in the course of his employment as such detective, and in anticipation of the possible need of the services of a lawyer by Mrs. Egan, he brought Mr. Harry P. Leonard to her residence and made her acquainted with him.

Quite shortly after the commitment of Mrs. Egan a proceeding for her release was instituted on the petition of Mr. Harry P. Leonard, and a writ of habeas corpus was obtained and served. Mrs. Egan's husband also commenced a proceeding for the appointment of a committee of the person and estate of his wife on the ground of her insanity, in which commissioners were appointed by the Supreme Court, and a trial was had before such commissioners and a sheriff's jury, and the proceedings under the writ of habeas corpus were adjourned from time to time until the conclusion of that trial. No final order was made by the court in the proceeding for the appointment of a committee, and that proceeding was allowed to drop, probably because of the fact that, while the jury agreed that Mrs. Egan was sane, two of the commissioners believed her insane, and the third qualified his concurrence in the conclusion of the jury in such a way as to create a doubt as to what his opinion was. The court then ordered the release of Mrs. Egan in the habeas corpus proceeding, but on a ground not affecting the merits of the question as to whether she was or was not of sound mind. In this litigation Mrs. Egan was represented by Mr. Tyng, who was actively assisted by the two Leonards, father and son. After her release an action was commenced in her behalf against the two physicians who had certified to her insanity and against the superintendent of the asylum to recover damages for false imprisonment. In this action Mr. Leonard, the elder, was attorney of record. It was upon the calendar and was brought to trial in the early part of 1903, when it was dismissed on the ground that Mrs. Egan had no remedy for false imprisonment,

though she might have recovered if sufficient facts existed and could be proved in an action for malicious prosecution.

Up to the time of Mrs. Egan's discharge in habeas corpus proceeding, which was in October, 1898, her only apparent delusion was an unfounded belief in the unfaithfulness of her husband with the Temperton woman. No proof that this belief had any foundation in fact was offered in that trial, or upon the trial before me. Mrs. Egan, in the course of that trial, expressed a belief that her husband was innocent. At other times she asserted that he was guilty, as charged by her, and subsequently she acted as she had done before her imprisonment, by persistently watching him, and having others do so, in her efforts to obtain evidence against him, and by annoying him by angry repetitions of the charges. When she indulged in liquor in great excess, as she did frequently, she compelled her husband to leave her house by actual violence or threats of bodily harm, and on these occasions he remained away until she recovered from her spree and requested his return, stopping at a hotel not far away sometimes for weeks at a time. I do not think it strange that the sheriff's jury refused to find Mrs. Egan insane on proof of this one delusion as to the infidelity of her husband with the Temperton woman. The detectives employed by her, or one of them, had made false reports to her of facts alleged to have been observed by him which might have been believed by a sane person; and mere jealousy, though unfounded, is a frail support for a judicial finding of insanity. But the subsequent conduct of Mrs. Egan justifies the judgment of the physicians who recommended her confinement, and requires the conclusion that in 1898 she had a disease of the brain, which, with her continued use of alcohol, progressed so as to make her plainly an insane person prior to December 16, 1902, when the propounded paper was signed by her. Her delusion of jealousy as to the conduct of her husband with the Temperton woman continued to the time of her death; but other delusions became manifest, and at times seemed to be predominant. Among these was the delusion that the "Cox house" had been purchased by her husband, and that he was using it as a place in which to harbor two women who had been actresses at Proctor's Theater as his mistresses. There was absolutely no pretense of plausibility for this delusion, and its connection with the previous delusion as to the Temperton woman, who had been a servant in the same house, is quite apparent. That house remained vacant for a time, and while it was so vacant Mrs. Egan hired a room in a house opposite for the purpose of watching it. It was purchased by a respectable gentleman, who afterwards resided there with his wife and two grown daughters. Mr. Egan was not acquainted with the family, and never visited there. The ladies suspected had never had any connection with any theater, and it is not suggested by any person that they did not live quiet and blameless lives. The house adjoining Mrs. Egan's on the east is, and for many years past has been, used as a hospital for the treatment of diseases of the throat and ear. Numerous reputable physicians are on its staff, and it has always been known as a decent and quiet establishment. In April, 1900, there was a change of matron in this

hospital. The new matron, with her husband and two little girls, aged about 13 and 15 years, respectively, then came to reside in the house. Mrs. Egan was a stranger to all of them, but within a week after they came there Mrs. Egan came to the door of the hospital with a man, believed to be one of her detectives or a policeman, and charged that the house was being kept as a resort for lewd persons, and that her husband had been beguiled into it, and had been guilty of immoral acts with the two children of the matron and other women. Thereafter, and so long as Mrs. Egan was physically able to persecute them, she made known to them and to others her false belief that the matron and her daughters were leading immoral lives. A further delusion, or a series of delusions, on the part of Mrs. Egan as to the occupants of this hospital became manifest at about this time. She alleged that certain persons, designated by her as the "Whalens" and the "Duns" and by other names, were in that house as a convenient place from which to persecute her. She also believed that the house in her rear, fronting on Thirty-Fifth street, contained other people, who remained there for a similar purpose. These people had power, as she alleged, to transform themselves into animals or birds, and they visited her house as dogs, or cats, or parrots, changing their forms in her presence. She believed that they stole her property, and that they mocked her. At times they were seen by her in the form of "red devils." She said that they had wires connected through the party wall of her house, and from the Thirty-Fifth street house, and that they could see her and hear what she said and what was said to her at all times. She complained that they annoyed her when she went to take a bath, or when she undressed for bed, and that the noise of the "wires" made it impossible for her to sleep. She also thought that they made noises all night long in the hospital next door. As a protection against these "spirits," as she sometimes called them, she would throw water about her room and on the carpet. She said that this would "drown the spirits." She also threw water on the stoop of the hospital and into the window of the front room of that house, which was on the same floor with her bedroom, presumably for the same reason, and greatly to the annoyance of the matron of the hospital and her children. Of course, all of these things were purely imaginary. No one else saw the animals, or birds, or wires, or red devils that she claimed to see, or heard the noises which she thought she heard. The persons she accused of annoying her did not live in the hospital next door or in the house in the rear, and they had no existence outside of her disordered mind. The evidence demonstrated with such fullness of detail that she entertained these delusions, and that she spoke of them to many persons, if not to every person she talked with, and repeatedly, that I felt that the time of the court was being wasted, and requested that counsel for the contestant should not call further witnesses merely for the purpose of corroboration.

Mrs. Egan fancied that the police could protect her from these annoyances, and about October, 1902, she made an oral complaint to the police captain in the precinct in which she resided, and he ordered one of his officers to make an investigation, which he did,

making several visits to her for that purpose. On January 22, 1903, she verified a written complaint, apparently prepared by a person familiar with legal writings, in which she gives names to her imaginary tormentors, and asked for protection. This was filed with the police captain, who again sent an officer to relieve her mind, though the fact of her condition was then quite apparent to him and to every sane observer. It was in the interval between the oral complaint of October, 1902, and the written complaint of January, 1903, that the propounded paper was executed. From the time when Mrs. Egan was discharged from imprisonment, in 1898, until a time in 1903, when her increasing infirmities and physical weakness made it difficult for her to be about, she was a frequent visitor at the office of the Leonards. She expressed to various people her confidence that they could and would relieve her from the troubles with the Whalens and others. She was sometimes dissatisfied with their tardiness, and as to the lack of results from their interference; but her visits continued, nevertheless, and she became a familiar figure in their office. Harry Leonard called upon her at her house at least once, and in October, 1902, or about that time, and within a month or two before the date of the propounded paper, she visited him and his wife at their country residence on or near the Palisades, in New Jersey, remaining for two nights. In my opinion, Mrs. Egan was, on December 16, 1902, hopelessly insane, and her delusions were then so fixed and her condition was then so chronic that she had no lucid intervals during which these delusions were not the controlling influences in her mind.

An examination of the provisions of the propounded paper will disclose the fact that they were the direct results of her delusions. Her husband's conduct towards her was shown to have been most kind, and she declared her fondness for him to numerous persons and at various times. Her sole provision for him was a legacy of $5. Her adopted son, for whom she always evidenced the greatest affection until towards the last, she complained that he did not sympathize fully enough with her imaginary troubles and "sided with Mr. Egan," is given $5,000. To her "loving niece," to whom she declares herself indebted for kindness and sympathy, she gives $5,000 and some furniture and jewelry. To her brother and sister she gives $1,000 each, and she gives legacies to her pastor and for charitable and religious purposes amounting to $5,000. The total amount of these legacies is about $14,000. Of the entire balance of her estate, amounting to between $42,000 and $60,000, she gives $5,000 each to Mr. Tyng and the elder Mr. Leonard, and the remainder to Mr. Harry P. Leonard and his wife. As a reason for bestowing these large gifts upon her attorneys she describes Mr. Henry W. Leonard as one "to whom I am indebted for my freedom, and who has guided my interests during the past several years to my great advantage"; and she says of Harry P. Leonard that he is "the son of my faithful attorney, Henry W. Leonard," and that the provisions for him are "in appreciation of his faithful and zealous labor in my behalf during the past several years, and during which time he has been like a son to me." As a matter of fact the only

"affairs" which Mrs. Egan had during all of the time of her acquaintance with these gentlemen were the litigations already referred to and the withdrawal from savings banks of some thousands of dollars, which she gave to them as payment therefor, and her troubles concerning her jealousy of her husband and with the imaginary Whalens and the Duns and their spirit confederates. The "faithful and zealous labors" of Harry P. Leonard had no object upon which they could have been expended during the several years preceding the date of the will, except in sympathizing with her concerning her delusions. The nature and extent of his social relations with her during that period have already been fully recited.

These delusions were, therefore, the very foundation of all of the relations between Mrs. Egan and the Leonards. It was in a litigation concerning those delusions, and as to whether they were delusions or not, and in advising her concerning those delusions, and in sympathizing with her concerning them, that all of their services, real or pretended, were rendered. Their attitude towards her fancies were sympathetic. It was a part of her delusion that they could and would protect her from persecutors, the very existence of which was denied by her husband and every one of her intimate friends. All of the legacies to Mr. Tyng and to the elder Mr. Leonard and to Harry P. Leonard were induced by the delusion and false belief that they, and particularly Harry Leonard, had rendered her aid and assistance in her imaginary troubles, which was a part and portion of her insanity. I am also of opinion that this false belief of Mrs. Egan in the aid which Harry P. Leonard and the lawyers named as beneficiaries in the propounded paper had given her and would give her in her dealings with the imaginary Whalens and others was fraudulently created or fostered by Harry P. Leonard in order to obtain the execution of the propounded paper, and that this amounted to such fraud and undue influence as requires that probate be refused to it.

There is another ground upon which probate must be refused to the paper. Harry P. Leonard, the main beneficiary, stood in a position of peculiar confidence towards Mrs. Egan. Though not a lawyer, he was the clerk and assistant of her attorney. His relations with her were those of an attorney, and concerned legal matters, and for all of the purposes of the dealings between him and her and the rules of good faith and the presumptions of fraud from transactions in which he received benefits at her hands he is to be treated as if he were an attorney. Nesbit v. Lockman, 34 N. Y. 167; Poillon v. Martin, 1 Sandf. Ch. 569; Hobday v. Peters, 28 Beav. 349; Nesbit v. Berridge, 32 Id. 292.

So far as the legacies to the other attorneys were concerned, he represented them. He drew the will, and she had no independent advice. He was present when the will was executed, though he may have retired into the adjoining room for a few minutes. She was, upon any theory of the facts, a poor demented old woman, with an exceedingly feeble mind, even if any mind remained. The paper disposes of the larger part of her estate to persons not natural objects of her bounty. Using the language of the Court of Appeals in

Matter of Smith, 95 N. Y. 516, 523, taking all of the circumstances together "a case was made which required explanation, and which imposed upon the proponent the burden of satisfying the court that the will was, the free, untrammeled, and intelligent expression of the wishes and intentions of the testatrix." See, also, Matter of Rintelen, 77 App. Div. 142, 78 N. Y. Supp. 1092, affirming 37 Misc. Rep. 462, 75 N. Y. Supp. 935. This burden has not been borne by the proponent. There is not a scintilla of evidence in the case, outside of the paper signed by Mrs. Egan, that she desired to make any legacy to either of the two lawyers, or that she desired to give any part of her estate to Harry P. Leonard's wife, or that she desired to make him the principal object of her bounty, or that she knew that such provisions were in the paper when she signed it, or that she learned of that fact at any time afterward. The only evidence as to the preparation of the paper was that of Mr. Alfred Lehman, who, as representing the American Bankers' Protective Association, occupied a desk near that of Harry P. Leonard, and says that he heard Mrs. Egan ask Harry P. Leonard to draw her will, and thereafter saw her and him in whispered conversation, Mr. Leonard making occasional memoranda. This was on Saturday, and three days later, and on Tuesday, he says he saw Harry P. Leonard take a typewritten paper out of his desk and hand it to Mrs. Egan. They stood together, and spoke in low tones, but he says he heard Mrs. Egan read the paper, and professes to remember, two years thereafter, enough of the contents of the paper thus read, so as to show that the reading was not for his ears, as to identify it with the propounded paper, which was then executed as a will. He tells us with particularity the parts of the paper which he heard read, and did not hear anything about any legacy to Mr. Tyng or to either of the Leonards. Assuming his testimony to be sufficiently credible to require me to base a finding upon it, does not establish that Mrs. Egan knew that the paper contained the provisions that are found in it. Mr. Phelan, the ex-detective, states that shortly after Christmas, 1902, Mrs. Egan said that she had made Harry Leonard a Christmas present in her will. This witness was so impeached that I do not hesitate to refuse to believe him; but his testimony, if believed, does not require a conclusion that Mrs. Egan knew the size of the gift she was making. Apart from what these witnesses swore to, the record is absolutely barren of any evidence that Mrs. Egan knew what was in the paper.

The paper was executed with three witnesses—one a person having desk room in the office, and two who were clients and friends of the Leonards. Two of these witnesses were examined, and neither of them claimed such an acquaintance with Mrs. Egan as would make his evidence valuable on the question of her mental condition. The third witness, a physician, who had the appearance of being a man of unusual intelligence, failed to obey a subpœna requiring his attendance, and when brought into court by the sheriff on an attachment asserted that his mind was a complete blank on every subject concerning Mrs. Egan or the execution of the paper, and refused to remember anything whatever. Not one of the witnesses knew anything about the contents of the paper, and they none of

them had any idea of the amount involved in a transaction, which they appear to have regarded as something in the nature of a joke. Assuming that Mrs. Egan had possession of the paper after it was executed, there is no evidence that she ever read it and understood its force and effect. No witness has testified to any declaration of Mrs. Egan of an intention to make such testamentary dispositions.

Entertaining the views I do with regard to the propounded paper, I regard it as entirely creditable to Mr. Tyng that, with full knowledge of it, and of the benefit which would accrue to him by its being admitted to probate, he has refrained from taking any part in the proceeding.

The propounded paper will be refused probate. Tax costs and settle findings and decree on notice.

Probate refused.